We will have a hear argument as soon as the lawyers are ready in United States v. Brown Thank you, Judge Motz. May it please the court, Eric Brignac for George Brown. Defendant at a revocation hearing has the right to question any adverse witness unless the court determines that the interest of justice does not require the witness to appear. This court's interpreted that rule to mean that a district court must balance the releasee's interest in confronting an adverse witness against any proffered good cause for denying such confrontation. The reliability of the declarations, as this court clarified in Ferguson, is an important factor, but it's not dispositive. Demonstrating that declarations are reliable does not obviate the requirement to show good cause. Joint Appendix 127 to 129, the district court says twice that, quote, the court just has to determine whether the hearsay evidence that's presented is demonstrably reliable. The district court did mistake the standard, but it also stated it correctly another time, right? Yes, so the district court clearly misstated the standard, but the district court also did reference this court's decisions in Doswell and Ferguson. I'm looking on page 131. It says, I note that it seems to be a focus on rather this demonstrable liability standard and whether there was good cause. Right. Yes, and your Honor is right. Is that the wrong standard or is that the right standard? It is the right standard. It is a balancing between good cause and reliability. And so the district court, on this record, misstated the standard twice and correctly stated the district court actually did. So if the court had applied, so which test did it apply? If it had applied the right balancing test, it would have found that the government didn't meet it. In Joint Appendix 93, what is good cause for the non-appearance of the witness? The witness is asked, Kahute Kishute is asked, what were the attempts to locate the witnesses? And for three of them, for Mr. Sifra, Mr. Bug, Mr. Webb, they were in jail. That's it. That demonstrates their location. No indication that the government spoke to these witnesses. No indication that it spoke to their attorneys. No indication that it approached the state of Ohio. No indication that it attempted to rip these witnesses out. It's a demonstration that these individuals were in jail. But much like in Doswell and Ferguson, no actual evidence of any attempt to bring these witnesses to court. When you talk about subpoena, how feasible is that in the real world? Didn't the district court make the observation that these people did have constitutional rights about testifying? Yes. And you certainly would be avowing their constitutional rights, right? Actually, Your Honor, my office has this all the time. These individuals, according to the government's own testimony, had all confessed to wrongdoing on their part. The opportunity that this would have provided them to testify in federal court against another individual, that's a golden ticket, Your Honor. These individuals, far from coming and saying, I wouldn't have wanted to testify, I wouldn't have invoked the Fifth Amendment, we don't know. They were never asked. But in my experience, the strong indication is, wait, I can go down, I can cooperate, I can work with the government. That's what defendants want to do. And you've had cases where you've had bail revocation where witnesses who were in prison have been subpoenaed? Your Honor, I cannot recall an instance from my office, and again, I think it would be a writ instead of a subpoena, though I know that's not the thrust of Your Honor's question, of course. Deferred to you on it. Well, and it's, I think, relevant because the district court here did focus on subpoena, which was actually not the power that the court had. And Your Honor, so no, to answer your question, I cannot recall that. Certainly, there are many instances that I can recall where witnesses have been brought out of state custody to testify in trials when there was a Sixth Amendment right. The ability of the most powerful government in the history of the world to get someone from Ohio, writ them out to court and have them testify is, it is not impossible. And I know impossible is not the standard. But what this record shows is we don't see any attempt by the government to do that other than to say they're in Ohio. Let's assume you're right on this point. What difference does it make? I mean, the district court was pretty clear that even if, I'm looking at Appendix 142, 143, even if I only looked at the three grade C violations, which have nothing to do with the folks in Ohio, I would impose the same 30-month sentence in sites to our cases. So why isn't that, if it's error, why isn't it just plainly harmless error based on what the district court said? Two responses to that, Your Honor. First, under Salveoma, Tutte, and Hargrove, it is a two-step analysis. The district court must indicate on the record that it would have imposed the same sentence. Your Honor pointed out that the district court did. But then that sentence, this court would have to find, would be reasonable. And it breaks down there because this was a 30-month sentence on a 6 to 12-month violation, all of which were breaches of the court's trust. The court did not go into an analysis explaining why this breach of trust was any more than absconded. It goes on in the following paragraph there on page 43 to describe the defendant's history in some detail before he then comes back and announces an alternate variant sentence of 30 months. Why isn't that sufficient? I do not, Your Honor. It's a sentence that is... You don't, but tell us why. Because a breach of the court, every revocation by the court's trust. One of the violations was paying some of his monetary obligation, but not all of it. Two of the violations were effectively the same violation, absconding and then failing to take the drug test, which are the same violation. Nothing about those violations on their face would justify or could justify an upward variance at the level he proposed. He relied on breach of trust, but of course breach of trust is going to be present. You're revoking supervised release. If I may just get to the second point, one of the other things the district court said here, he indicated several times, and hey, if the standard here is unclear, I would love it if the Fourth Circuit could clarify this. I would love it if the Fourth Circuit could send this back and give me the correct rule, tell me what to do. This gets to Chief Judge Gregory's dissenting opinion in Gomez-Laminez where he talks about one of the downsides to assumed harmless error is it takes this court out of one of, if not its most important role, which is to clarify the law and to provide rules to the lower courts and to litigants. First, I would say just on its face, the district court's upward variance here is unreasonable and is not justified, but I would also adopt Judge Gregory's position and say that, you know, here you have a case where the district court's saying, you know what, if I'm wrong, if I need clarification, if I didn't do this right, please tell me, but then suddenly this court sort of handcuffed itself and is unable to tell us. It will just say, well, even if the error were harmless. Of course, the problem with that is we have to go on back. I mean, I think that you make a fair point about the assumed error harmless, but that is the law. We've made that call. You know, Your Honor, and I'll say I'm a public defender, and if we want to take that on bank, you know, the Hargrove case came out of my office, and so I fully understand, and I think there are multiple problems with that, which are not, as you pointed out, for this panel, but maybe this case is a great example and something that would ultimately inspire this court to do that, but again, at the same time, respectfully, I don't think we even need to report violations that many times a probation officer may not even report, or if someone goes and absconds and fails to report, they're brought to court, and the district judge continues them on supervision. A 30-month sentence for, again, in the district court's own words, what are effectively grade C violations is an extreme sentence, and this record does not support it. Of course, Judge Agee pointed out the district court said something, but that something is not enough. I would also say that the government's attempt here to, in the district court's application of the Ferguson and the Doswell standards, you know, it obviously leads to a strong potential for abuse. We have absolutely no indication the government operated in bad faith here, but, you know, sending a signal that if you have potential witnesses who are logistically difficult to get down, they live far away, they're in jail. I understand your position, what these witnesses were, what your client wanted to do was to cross-examine these witnesses, but they didn't believe what they were saying. Is that right? Yes, Your Honor. And I understand you weren't counseled below, but if you thought that there was such a great need to cross-examine them, did you suggest to the district judge that? To cross-examine the witnesses? Yeah. Well, we asked to have them brought to court so that we could cross-examine them. You told them you made a proffer about what they would say? Oh, no, Your Honor, we did not make a proffer because we, the witness would testify. I understand it was their burden of proof. I do get that. What I'm trying to do is to flesh out what representations you made to the district court, because you say that he just acted improperly, and I want you to know sort of what was in front of him. So the district court... A corollary to that is, recognizing you didn't try this below, I mean, what effort did defense counsel make to try to find out what these individuals would say? To my knowledge, Your Honor, we did not make any effort to find out what they would say. It was the government's witnesses, the government's burden of proof. What should have happened is, you know, the government, I think very wisely, brought to the court's attention this was going to be an issue. We responded. The hearing was a double hearing, both on the merits and on the unavailability of the witnesses. And when the district court, basically the point at which the government said, these witnesses are in jail, they're unavailable. That wasn't enough to show good cause. Now, if the government had said, you know, here's what we did, we've tried to rit them out, we've gone to the jail in Ohio, the jail is under a quarantine. And the jail is under a quarantine, there's a TB outbreak, and, you know, this happens. And for 60 days, no one's coming in or out. Something like that. Or for these reasons, it would be this expensive to do this logistically difficult. Those are actual facts the judge can then exercise his discretion on. Not merely the mere indication that they're in a jail with absolutely no indication of how difficult it may actually be to get them out of that jail. There is, of course, a fourth witness, Mr. Stevens. An example of facts that the district court could exercise his discretion on, Mr. Stevens was homeless. And they tried to contact his family members, they looked for his address at the post office. That's the kind of effort and basic effort that they didn't apply to these other witnesses. Also to get to reliability, Mr. Stevens was homeless, indication his family drifted in and out of homelessness, strong indication of mental illness there. Actually three of their witnesses, Mr. Sifra, Joint Appendix 62, Mr. Webb, Joint Appendix 90, and Mr. Stevens, all were homeless. So the district court said, you know, I find these declarations reliable. But what you really do have is at least three of these individuals, homeless, homelessness, often associated with mental illness, with declarations, it's not something that you would necessarily look at and say, you know, this homeless criminal is definitely reliable. His hearsay is reliable. Without any indication of what incentives he may have had to testify in the way the police wanted. Now, comparing it to Dowell, Doswell, and Ferguson, those were chemistry reports. And, you know, after Melendez-Diaz, I was in a public defender's office, we were all excited about this new opportunity to cross-examine chemists. But in reality, you know, chemistry, drug lab reports are really reliable. But in reality there's a big difference between a civilian chemist and transporting three prisoners the long distance. You know, you make it sound mighty easy. Well, they're in custody so we can bring them down here. Transporting three prisoners is mighty dangerous. That's, I think, obvious. Maybe you don't agree with that. Well, you know, I see it happen all the time, Your Honor. And I think, you know, in the Woods case, unpublished from this. You're going out for revocation hearings. You know, Your Honor, I believe the discussion we're having right now is the discussion that should have happened in the district court. The government should have explained how difficult it was to get these individuals. That's common sense. You don't have to explain it. And, Your Honor, I disagree that that's common sense. The government, the nature of criminal prosecutions is that convicted criminals often testify in other trials, often testify in other hearings. So transporting prisoners How often have you used video? Hmm? How often have you used video? We use video conferences, Your Honor, in jails to speak to our clients. And that's actually another something the district court, the government did not present, something else that could have been considered. You didn't present it either? No, Your Honor, but we wanted to cross-examine these witnesses. And had the government or the district court, again, conducted the actual inquiry instead of simply saying, they're in state jail and that's enough, or they're in a state jail And again, I'm not going to concede this point that when the district court said, all I need to find is reliability, that he didn't mean that. He did articulate the proper standard later, but he very expressly articulated the improper standard that was wrong as a matter of law. Let me ask you this. If they were going to be questioned, then aren't you going to have to afford them a right to counsel? I mean, these guys are not, we're never charged with this. They're not convicted of it. So you're going to ask them questions about this criminal offense. Aren't you going to have to afford them a right to counsel? May I respond, Your Honor? Certainly. Thank you. If I were the district judge in that case, I would afford them the right to counsel. I think certainly the Fifth Amendment issue would have come up. And again, I will say if I were their counsel, I would probably advise them, having already confessed, to waive that and to eagerly testify and to help themselves and to cooperate with the government. But yeah, Your Honor, I think it would have been, I certainly would have given them a lawyer because they're testifying in court. Thank you. Mr. Rubin. Good morning. May it please the Court. Good morning. Philip Rubin on behalf of the United States. In many ways, I think this case is about asking the right questions. My colleague focuses greatly in the briefing and here this morning on the question of unavailability. But when it comes to whether the use of hearsay at a revocation hearing, unavailability is not actually the test this Court has prescribed. The test, as this Court said in Doswell, the Court must balance the releasee's interest in confronting an adverse witness against any proffered good cause for denying such confrontation. Unavailability in the technical Rule 804 sense is only one way that the government might show good cause. And there is no requirement in any court, in any case that I have found, that the witness must be truly unavailable in order to meet that standard. Well, of course, we are on availability because that's where the district court was, right? I actually, I think the district court certainly looked at it. I do. But I think the court actually, if you look at it, Your Honor, I think the court talks about unavailability and their Fifth Amendment rights. Well, it says that at one point. It says a lot of things. There's lots going on. And that's the first point I would like to address is about the district court applying the right standard. And I think the district court did apply the right standard. While the district court was talking about other issues such as reliability, there were times when the way the court stated the standard was not exactly correct. I agree. But I think the district court does deserve some credit for the fact it quoted from this court's decision in Doswell. It clearly had not only read it, but I think it probably had it in front of it during the hearing. And when it came time to make its determination, as Judge Traxler, you quoted from page 131, the court said, I note that it seems to be a focus on rather this demonstrable reliability standard and whether there was good cause. And I do find there was good cause in that three of these individuals are incarcerated and do have a Fifth Amendment privilege. One was not able to be located. This district court, I think it cannot be said that the district court did not find good cause because the district court said, and I do find good cause. And so as an initial matter, I think the court, the hearing taken as a whole, applied the right test. It was certainly well aware of Doswell. This was in Ferguson. This was an experienced district court. The parties had briefed this matter with the correctness. The opposing counsel's argument to be that there was insufficient evidence to find good cause? I think I take defense counsel's argument to be both. I think that's maybe a little newer this morning that there was insufficient evidence to find good cause. I took the briefing more to focus on that these witnesses were not truly unavailable. And that was why I start out saying that it's about asking the right questions because that isn't the question. I think there's a set of things. And this court has not had the opportunity to speak in a published way on what good cause is. Both Ferguson and Doswell didn't get into what good cause is because there was no attempt to show good cause. The district court didn't find good cause. But I think good cause certainly could be unavailability, but there's also cases that suggest that the burden on the witnesses is another factor to be considered. In fact, in Morrissey itself, it talked about fear of retaliation being a reason you might not present a witness in a parole revocation hearing. And fear of retaliation, while very significant and very important, is not unavailability. That witness isn't bailed. There's just a fear of retaliation. Can I ask you a fact question you might be able to help me with? If we exclude the serious violation here and we go with the first three, could you get this sentence? I think you could, Your Honor, yes. You'd stack them? What would you do? Well, I'm thoughtful of the fact that Chapter 7, these are the original advisory guidelines. Because these were policy statements and they still are before you even had advisory guidelines. And Chapter 7 actually states that it's not intended to capture everything. For example, one thing it says is, these guidelines don't account for multiple violations like you had here. So if he had had one grade C violation, the range would have been 6 to 12. If he had had eight grade C violations, the range would have been 6 to 12. The guidelines actually encourage courts to take account of that. So that's one fact. So, okay, I hear you. So there were three, 6 to 12. So have you ever seen a case where there has been these minor violations and there's been this very harsh sentence? I've actually seen a good number of them in this very specific context, Your Honor. A lot of our judges, when they were revoking someone for a second time. Is that what this was? Well, this defendant actually was on supervised release, of course, from an Eastern District of Virginia case. That's our case now. That conduct that he was convicted of in the Eastern District of Virginia was while he was on supervised release for the same conduct out of, I believe, it was the Eastern District of Pennsylvania, mail theft and bank fraud. So it's not two revocations in the same period of supervised release, but this is not the first time this defendant has been revoked. The district court didn't rely on that. The district court actually talked about that this was, he's continued on this path of conduct, and it reviewed his past crimes. And so I think the court did. It was actually a pretty fulsome, it's about pages 140 to 143. But I don't remember him talking about violating probation. Earlier in the hearing, he got clarification from the parties on exactly how that sentence was run. He found out from, I believe it was the probation officer, that the revocation sentence was run consecutive to the Eastern District of Virginia sentence. So I think, at the very least, it was quite clearly in the court's mind because the court actually solicited information on that during the hearing. But I don't think you just have to do that. Of course, he has discretion to do whatever he wants. I was just trying to understand. Absolutely. And to me, I think one thing is the multiple violations. You could literally stack those guideline ranges, and you would get 18 to 36. I don't think it's necessarily that simple. It's not a mathematical exercise. I think if you, what I would commend to the court is Officer Thornton's testimony during the hearing. This was a defendant who was just absolutely disregarding his supervision. And not, you know, even setting the criminal conduct aside for a moment, this was a defendant who she could never reach him. When she finally would reach him, she'd tell him to come in, and it would be a day, a week. When he came in, she testified that he was untruthful with her about the rental cars. He denied the second time the car that was taken to Ohio. First, he lied to her. He denied renting the car. Then, after some pressure, he said, I rented it, but I rented it for a friend. And she said that the name he eventually was willing to give her was plainly unbelievable. Say that last part again. The name that he eventually gave her, the friend. She said, who's the friend? At first, he refused to say. Then she said the name that he gave was just unbelievable. The name, I think, was Teddy Hall. In her opinion, he was not truthful about any of that information. Not to mention, this car was rented. He was the probation officer that was doing the car revocation. That's correct, Your Honor. Yes. And he was actually being supervised in the Eastern District of North Carolina for, I think, all of this release. The actual authority over it was not transferred until just before the revocation motion was filed, but Officer Thornton had been working with him throughout that period, because he was released into North Carolina. And so when you have all that testimony together, and this was a defendant who rented this car, again, setting the criminal conduct aside, his driver's license, his credit card, and then says it was somebody else who was driving the car. Didn't we say in one of our opinions that corroboration was not relevant? Whether or not the incident was corroborated was not relevant to the consideration of whether or not witnesses ought to be brought? I think this Court has said that you have to find good cause. You can't just say this is incredibly reliable. And that is a split in the circuits. The Third Circuit has said that sometimes reliability can be so strong it overwhelms the need for good cause. This circuit, I think, was very clear. In Doswell, you must always find good cause. I'm not sure if I understood your question. I'm looking at Ferguson. It says the existence of corroborating evidence does not relieve the government's burden of offering a sufficient justification for the absence of the witness. And I think that, to go back to the merits of the case then, to the subset of merits, I think that goes to the fact you must always have some form of good cause. And we've been thinking a lot about this at my office, and this is the way that we understand the test. This Court has talked about how you have to weigh the good cause that's offered against this defendant's interest in confronting the evidence. And that interest is not always the same. This Court in Doswell cited a Tenth Circuit case, Chester, for the proposition, all circuits agree reliability is a very important factor in determining the strength of a releasee's confrontation right. So as the evidence becomes more and more reliable, that confrontation right would go down, and the amount of good cause that the government would need would also be lower. But Doswell and Ferguson, and what you just read from Ferguson, Your Honor, says there always must be some good cause. Unlike the Third Circuit in a case called Lloyd, you can never have a case where we say it's just so reliable. We don't even need to worry about good cause. We always have to show something. But in a case where the evidence is highly corroborated, which I would contend this is one, the amount of evidence that we would need to show, or the amount of good cause that we would need to show, would be lesser. Say in this case we only had one witness, so you couldn't cross-corroborate them with each other. I think then the amount of good cause would go up, because at that point the releasee's interest in confronting would be higher as well. What would happen if, say, the three witnesses that were incarcerated in Ohio were instead incarcerated in the county jail in the same locality as wherever this probation hearing occurred? Would the calculus be different then? I think that it would still be good cause in this case, but I think it would certainly lower the volume of good cause in a very specific way. One of the things that Judge Traxler, you mentioned, was that bringing these witnesses at long distance from state custody in Ohio, that's both dangerous, it's also costly, it's time-consuming. Judge Agee, in your hypothetical, some of those would go away. If they're in the Wake County courthouse that's down the street, I couldn't say that it would be terribly expensive. There's maybe a little danger, but not anything I would note as good cause. But you would still have the Fifth Amendment issues. And I think it's kind of a role reversal here, because I think my colleague and I disagree quite a bit on what advice would be appropriate for those witnesses. As government counsel made clear in the district court, they had been given, we were not prepared to give them any guarantees out of the Northern District of Ohio, based on their testimony. So the idea that they would do it. Yeah, but we're hypothesizing, we're going with Judge Agee's hypothetical. Now you have local folk, you all speak the same language. And if you transfer the whole investigation, say, in our office, there were no guarantees given that if these witnesses testified in this hearing that we would do anything for them. And, yes, they had already given incriminating statements to police. But I think the reality is most defense attorneys would tell their client, don't say anything. Now you're in court. That will be much easier to use against you in a criminal trial. And as we told the district court, all of these witnesses were under investigation or pending charges in the Northern District of Ohio. Of course they shouldn't testify in court on the basis of that criminal conduct. And I think any defense attorney would tell them not to, unless they had been offered some kind of cooperation deal, which had not been offered. See, push didn't come to shove. So we don't know what would have happened if they'd come in. And I, my own experience in life is that cases don't settle and deals don't get made until you're actually there, by and large. So that I think saying that we hadn't made any definite, I don't, that doesn't go anywhere with me. Well, I think I hope that it could go somewhere. I agree, Your Honor, where I think there could be something to consider is that this is a revocation hearing. And I'm not familiar with us making cooperation deals in order for revocation hearing. That's a whole different. So you make a, a very strong distinction between the revocation hearing and a straight up trial or sentence. I do. I do think that there, I don't want to suggest that they're not serious business. They involve incarceration. They're serious, but they are supposed to be more informal than a criminal prosecution. Yes, Your Honor. Do you think cost and convenience are factors to weigh in determining good cause? I do, Your Honor. I think cost and convenience, and in fact, that kind of helps to explain Doswell and Ferguson because there you have a lab analyst. And you're unlikely to have these issues of witness retaliation or Fifth Amendment. The real issue with lab analysts and bringing them is. So what do you tell a defendant? You've got two defendants. One of them, the witnesses against him are in the same jail with him or in the same town. The other one is in the exact same situation with the witnesses. They're going to be used against him or in California. So if one gets them and one doesn't, is it because of cost and convenience? I think it's possible it may work that way. And the reality is factually that happens in other ways. This witness, the witnesses against this person have disappeared, and then we could definitely use their statement. Well, that's a whole different situation. You know the guy's in California. I agree it's a different situation. I'm suggesting that you have defendants who maybe are similarly situated in terms of their conduct, but for various reasons, either unavailability or your Honor's hypothetical, they may not get the same. It's a very uncomfortable holding, I think. I think what the court can do is balance. And again, it would depend on what the defendant's interest in confronting those witnesses. So it's about how reliable is the hearsay. I think that's the main factor in how strong the defendant's interest, how well corroborated is it. And you would balance that against a good cause. So the other thing is that depending on how corroborated one defendant, the witnesses against one defendant are, that defendant may have a stronger argument against good cause than you have in another case. I think it's a very fact-bound inquiry. I think it's something that district courts, though, are very well equipped to do. And I think there's four main categories of things that would make good cause that I have found. There may be more. Burden on the witnesses. The interest of justice, that's where Fifth Amendment rights would come in. Economy, as well as the ability to bring witnesses at all. That would be unavailability if they're truly just gone. And to note one more thing about interest of justice, I would just note that it's a little more complicated here to approach these witnesses. It's not comfortable for us to approach people we're investigating to ask them to testify. And so that's another factor that comes in here as well. The government does that all the time. They do that all the time. Come on. If they're pending charges, to ask them to testify in this revocation hearing out of district that is separate from the main prosecution, I think that is something that would actually be perhaps a little bit more difficult for us to do in a given case. Well, it's a weighing process. And that happens in lots of prosecutions. And here you're not dealing with an interstate MS-13 murder and kidnapping trial. It's a supervised release from a revocation. It's qualitatively different, but the process is sort of the same. And I think that's the point I was trying to make. In a bail revocation hearing, does the person whose bail is going to be revoked, what constitutional rights does he retain? Certainly the due process clause. And I think that's what Morrissey really gets to. I think we're talking about parole or supervised release revocation, not bail. I think in those cases you certainly have a due process right. And the way that the court described it in Morrissey, it's a right to confront witnesses against you unless the court determines that the interests of justice don't require it. That's what led to Rule 32.1. And so that interest is not the same. We know the Sixth Amendment does not apply. We know that the true confrontation clause of the Constitution does not apply. But that's not to say that the due process clause doesn't have anything to say about confrontation. And I think that's what Morrissey explained. And that brings me back to sort of where I started, that Rule 32.1 does not use the word unavailable. Rule 32.1 says that the defendant has to have an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear. The Doswell case out of this court doesn't use the word unavailable or unavailability even once because that's not the test. The test is weighing good cause against the defendant's interest in the cross-examination. And I think that's exactly what the district court did here. The district court found that there was good cause. I think both these witnesses were not present, they were difficult to bring to court, but also their Fifth Amendment rights. Balanced against the fact, and I only have just a few minutes left to talk about the reliability of the evidence, but the reliability of this evidence taken together was very strong. I think the defendant started out in his opening brief just focusing on four lineups. But these witnesses had given the exact same modus operandi for this crime. And it's not just stealing mail and cashing checks. These checks were altered in very similar ways. It's how the investigation led to think these crimes were connected to begin with. And if you look at the checks, they're on page 162, 182, 186. You can see what the inspector was talking about when she said these checks were all done very similarly in a way that made them seem connected. These witnesses also explained that they were down and out, but they had two forms of ID, and the defendant and his co-conspirators approached them, said, you have ID, do you want to make some money? Bought them clothes, then took them and sent them in with these checks. So that's already a similar crime. Then you have the license plate, and that's something the district court called pretty striking and powerfully corroborative. And that was where Sean Siffer wrote down the license plate. He was scared of these defendants because he had essentially double-crossed them. He wrote down license plate VBB5250, and sure enough, the police had tracked that license plate to a car rented by the defendant with his credit card. That was when they started putting the defendant on the lineup. They showed that to Sean Siffer, and he picked out the defendant. And in fact, all four of these witnesses, most of whom didn't even know each other, all picked the defendant out of the lineup, all gave similar stories. It was all in the same geographic area around Cleveland, Ohio. And it was all with a car rented by this defendant. I think the district court took note of all of that evidence together. So reliability goes into the side of the equation about how much good causes the government need. This defendant's interest was low because this evidence was well corroborated. And then you add to that the cause that we have. But the witnesses had actually appeared and testified to all of that. I don't think this case would have never made it to oral argument. I agree with that, Your Honor. I didn't want to cut off your question. You've been a trial lawyer for a while. Sometimes the witnesses change when they're actually there. You know, they've told you one thing, they've said something in deposition, and then all of a sudden at trial they have a new version. Has that never happened to you? I'm actually supposed to be an appellate. You have to grow up a little. I know that happened. I'm certainly aware that that happens, Your Honor. But I am conscious of the fact, I think this court and the Supreme Court has already resolved the question that hearsay evidence can be used at revocation hearings. It can. There's a test that has to be followed. But the same standards of we just don't trust hearsay. I mean, that isn't the test that's used. The question is weighing good cause, which the government had here, against the reliability of this evidence, which was strong. And that is the test on pages 131 and 132 that the district court said it was applying, and it's the test that it applied. And the court's review of that determination is for abuse of discretion. And so I think it would be a lot to say that the district court, with this court's case in front of it, abused its discretion in making that determination. And we'd ask that you affirm. Thank you very much. Thank you. Thank you, Your Honors. Judge Agee, I agree we almost certainly wouldn't be here because the witnesses, their testimony would have either fallen apart when they were actually cross-examined on the only part of this case that connects it to Mr. Brown, which is the identification. So either the witnesses' testimony would have fallen apart and Mr. Brown would have gone to jail for 6 to 12 months, or their testimony would have been rock solid and I wouldn't have had much of a leg to stand on up here. To get the government led, certainly in the briefing I did focus on unavailability. That was because the government below and the district court focused heavily on availability. I think the government and I agree on the standard, which is good cause. And the reason good cause hasn't been met here, and the reason it is actually even an abuse of discretion, is because the district court didn't have enough facts on which to exercise its discretion. You pointed out, Judge Traxler, someone coming in in a situation like this almost certainly would need an attorney to advise them. Why? Because it's complicated. Because you're weighing pros and cons. Do I testify? Do I help the government? Do I expose myself to something else? I can tell you if I had a defendant who'd confessed to the police and he had the opportunity to testify to the same thing, and since his confession is going to be used against him anyway, I'd do it. Maybe there would be a disagreement there, but the point is the district court didn't have those facts in front of it. Yes, sir. Whether it was a marshal or one of these inspectors that had further testified, well, we've looked into it, and it's going to cost X to do the proceedings to establish the writ to get them down here. It's going to cost X to actually transport them. It's going to cost X to keep them here. It's going to cost X plus X to pay for the lawyers. It's going to cost this much to get them back. If the court had all that information and said, well, this is just too much, would that have satisfied good cause in your view? Your Honor, unless his conclusion would be an abuse of his discretion having digested those facts, I believe that would be good cause, which would then be weighed against the reliability. But exactly, Your Honor. It doesn't, the ways in which evidence could be presented to the district court, be it through marshals explaining financial situations or not, there are many ways it could be presented. It wasn't presented at all here. But yes, if he had facts and exercised his discretion on those facts, I'd be up here having to say it was just an abuse of discretion as opposed to he didn't actually conduct a good cause inquiry because all we have is common sense, which I just don't think is enough for this court to adjudicate. And one quick response, we talked about the 30-month sentence. Officer Thornton's testimony as probation officer, she said several things. On Joint Appendix page 106, she talked about information she had that Mr. Brown had been traveling in Georgia. And she confronted Mr. Brown about that, and he explained that he had a brother who looked like him and who often would give his name. And that does happen. Siblings will try and stay out of trouble by giving their siblings names. And she said, I didn't have any suspicions at that time because there had been no information that my offender, Mr. Brown, was involved in anything he shouldn't do. So it wasn't just that she came in and said, Mr. Brown was a horrible offender. I hated supervising him. There was clearly a relatively large period where he was doing what he was supposed to. He paid most of his financial obligations. The record doesn't support a 30-month sentence in the absence of the Grade A violation, Your Honor. Thank you. Thank you very much. We will come down and greet the lawyers, and then we'll take a short recess.
judges: Diana Gribbon Motz, William B. Traxler Jr., G. Steven Agee